Judgment rendered December 10, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,577-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

PAMELA SUZETTE CLOUD BYRD,
ET AL.                                    Plaintiffs-Appellants

versus

CHARLES D. KNIGHT, JR. M.D., ET
AL.                                       Defendants-Appellees

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 572,350

Honorable Brady D. O'Callaghan, Judge

* * * * *

NELSON & HAMMONS, APLC                    Counsel for Appellants,
By: John Layne Hammons                    Pamela Suzette Cloud
    Robert Clayton Christian              Byrd, Debbie Ruth Cloud
                                          Blake, Patricia JoAnne
                                          Cloud McKenna, and
                                          Estate of Rainniel Cloud

KELLY & TOWNSEND, LLC
By: Keenan Kirk Kelly

PETTIETTE, ARMAND, DUNKELMAN,             Counsel for Appellees,
WOODLEY & CROMWELL, LLP                   Louisiana Medical
By: Lawrence Wayne Pettiette, Jr.         Mutual Insurance
    Joseph Samuel Woodley                 Company, Charles D.
                                          Knight, Jr., M.D., and
                                          Thomas Trawick, Jr., M.D.

* * * * *

Before STEPHENS, ROBINSON, and ELLENDER, JJ.

**ROBINSON, J.**

Pamela Byrd and her two sisters (collectively "Byrd"), who sued on behalf of themselves and their father's estate, appeal a judgment dismissing their medical malpractice lawsuit related to their father's death. For the following reasons, we affirm the judgment.

**FACTS**

In the early morning hours on February 23, 2011, Rainniel Cloud went to the Emergency Room at Christus Coushatta Health Care Center ("Coushatta") with complaints of pain in his upper abdomen and back that had started five hours earlier. Morphine was ordered for the pain, which Cloud described as being a 10 out of 10. CT scans of the chest and abdomen were done. Dr. Kenneth Jones's impression was a possible dissecting abdominal aortic aneurysm. At 3:27 a.m., Dr. Jones consulted with Dr. Charles Knight, a general and vascular surgeon in Shreveport, about the transfer of Cloud to Christus Highland Hospital ("Highland") in Shreveport. After Dr. Knight accepted Cloud as a patient, he was transported by ambulance to Highland, where he arrived at approximately 5:30 a.m. The hospitalist at Highland that night, Dr. Boyd, had given verbal orders for admission.

Upon Cloud's arrival at Highland, a physician-assistant student under the supervision of the chief hospitalist, Dr. Thomas Trawick, performed a physical and took Cloud's medical history. His medical history included five stents, coronary artery disease, hypertension, deep vein thrombosis, abdominal aortic aneurysm, reflux disease, and possible chronic obstructive pulmonary disease. His home medications included Plavix, aspirin, the pain

medications Percocet and Lortab, a high blood pressure medicine, and two different types of inhalers. Plavix and aspirin are antiplatelet drugs. Cloud was on supplemental oxygen at home. He was not a current smoker but had smoked a pack a day for 50 years. His pulse was 63 and his blood pressure was 172/91. His liver function tests were elevated, so the physicians were concerned about a gallstone blocking a bile duct.

It was difficult for Dr. Knight to determine from the CT scan from Coushatta if Cloud had a dissecting aneurysm, so at 7:50 a.m., he ordered a repeat CT scan with IV contrast. The repeat CT scan showed no sign of an aortic rupture and that a short dissection segment appeared chronic.

Dr. Trawick noted that Dr. Knight was concerned that Cloud's symptoms were related to acute cholecystitis and that Cloud would need a laparoscopic cholecystectomy. Dr. Trawick discontinued the aspirin and Plavix since surgery was a possibility.

Dr. Knight wrote a progress note at 8:55 a.m. He suspected that Cloud's symptoms may be related to his gallstones, and thought Cloud could have acute cholecystitis or a common bile duct stone. He ordered a repeat liver function test, and considered a procedure to search for a bile stone if Cloud's liver function tests continued to rise. However, he thought Cloud would need a laparoscopic cholecystectomy.

Dr. Trawick brought in Dr. Stuart Blum, Cloud's treating cardiologist, for a cardiac consultation. Dr. Blum, who cleared Cloud for surgery, thought Cloud was at moderate risk from general anesthesia and gallbladder surgery, but did not consider the surgery to be elective. He noted that the

2

risk of a cardiac event during surgery would be mitigated by IV beta blockers.

Dr. Knight performed the laparoscopic cholecystectomy on February 24. The surgery started at 11:51 a.m. and ended at 1:05 p.m. He was presented with an acutely inflamed gallbladder with significant induration of the gallbladder wall. He also found the gallbladder difficult to grasp, which resulted in spillage of some stones and bile and some bleeding. Clips were placed on the cystic arteries, and hemostasis was secured with electrocautery. Dr. Knight instructed the nurses to contact him if Cloud's systolic blood pressure fell below 80.

Dr. Knight wrote orders at 1:10 p.m. for clear liquids, IV fluids, intravenous morphine as needed for severe pain, Lortab as needed for mild pain, a complete blood count ("CBC") and CMP chemistry test the next day, the monitoring of Cloud's fluid intake and output, and to be called if his systolic blood pressure dropped below 80.

Dr. Trawick saw Cloud at 3:20 p.m. He ordered IV fluids, morphine for pain, and that Cloud's blood pressure medications be held. Dr. Trawick next saw Cloud at 5:35 p.m. He thought Cloud may have had too much pain medication, so he ordered Narcan and some fluids. Dr. Trawick did a verbal order at 7:00 p.m. for a urinalysis.

Dr. Knight wrote a progress note at 5:00 p.m. He noted that Cloud was restless and confused, looked uncomfortable, had a systolic blood pressure around 90, and had mild distension and tenderness of his abdomen. He agreed with Dr. Trawick's order for IV fluids. He ordered the nurses to check his CBC and to continue the antibiotic. According to Dr. Knight, the

nurses called him at home with the CBC results, which showed that his hemoglobin was 12.6.

According to Dr. Knight, the nurses called him at 10:10 p.m. to tell him that Cloud's systolic blood pressure was in the 75-80 range. He ordered Hespan, which is a volume expander. He also ordered a type and screen of red blood cells and a STAT CBC.

The CBC showed that Cloud's hemoglobin had dropped to 8.5. Dr. Knight instructed the nurses to transfer Cloud to the critical care unit ("CCU") and to give him additional saline fluids. When Dr. Knight arrived at Highland around midnight, he started Cloud on the blood pressure stimulant Levophed.

Dr. Knight's note at 12:25 a.m. read that Cloud's systolic blood pressure was still in the 70-80 range despite receiving increased fluids. His impression was hypotension secondary to postop bleeding. The plan was to transfuse red blood cells and to perform a laparotomy surgery to control the bleeding. At 12:15 a.m., Dr. Knight gave a voice order to call out the surgery team.

Dr. Knight performed an exploratory laparotomy which began at 1:48 a.m. and ended at 2:30 a.m. His operative report described finding a large amount of clotted blood. It was nearly a liter of blood. Dr. Knight did not find bleeding from the gallbladder bed or the cystic duct triangle. Cystic artery clips were in place and there was no bleeding from the cystic artery. No active bleeding was noted from the omentum area. Dr. Knight placed a drain and had Cloud moved to the CCU.

Cloud's hemoglobin measured 9.6 at 4:45 a.m., and then measured 10.7 at 6:30 a.m. Dr. Blum noted that at 7:10 a.m., Cloud's hemoglobin measured 9 and his hematocrit was 29.

Dr. Knight's last progress note was written at 7:25 a.m. It stated that Cloud was unresponsive on the ventilator, his systolic blood pressure was 70-80 on Levophed, his drain output was about two ounces, and he had no severe tachycardia.

Cloud died at 9:47 a.m. on February 25. The discharge summary prepared by Dr. Trawick listed acute cholecystitis, acute blood loss anemia, shock, and abdominal aortic aneurysm as the causes of death. The death certificate listed the same.

The pathology report was completed at 11:53 a.m. on February 25. The diagnosis was acute cholecystitis with mucosal necrosis.

*Lawsuit*

On January 27, 2012, Byrd wrote to the Division of Administration requesting the formation of a Medical Review Panel ("MRP") for claims against Dr. Knight and Highland.

On August 12, 2013, Byrd wrote to the Division of Administration requesting to add Dr. Trawick as an additional defendant. A different PCF file number was given to the claim against Dr. Trawick.

On August 7, 2013, the MRP for the claims against Dr. Knight and Highland Hospital issued an opinion stating that the evidence submitted did not support the conclusion that Dr. Knight or Highland Hospital failed to meet the applicable standard of care as alleged in the complaint.

On October 23, 2013, Byrd and Cloud's estate filed a medical malpractice lawsuit against Dr. Knight, Highland, and the Louisiana Medical Mutual Insurance Company ("LAMMICO").

On January 16, 2014, Byrd wrote to the Division of Administration requesting to add Dr. Blum as an additional defendant to their claim against Dr. Trawick. On December 8, 2014, the MRP rendered its opinion. It concluded that the evidence submitted did not support the conclusion that Dr. Blum or Dr. Trawick failed to meet the applicable standard of care.

On January 16, 2015, Byrd amended the petition to add Dr. Trawick and Dr. Blum as defendants. On August 29, 2016, the trial court granted a motion for partial summary judgment in favor of Highland. In November of 2016, Byrd dismissed the claims against Highland and Dr. Trawick.

Trial was set to begin on May 6, 2024. On April 25, Byrd filed a motion for the partial dismissal of Dr. Blum. The motion was granted.

*Trial*

The jury heard evidence over four days beginning on May 7, 2024. At the conclusion of trial, the jury answered "NO" to the question of whether Byrd had proved by a preponderance of the evidence the applicable standard of care as to Dr. Knight practicing as a general surgeon in 2011. A judgment dismissing all claims against Dr. Knight and LAMMICO with prejudice at plaintiffs' costs was rendered on May 28, 2024.

**TRIAL TESTIMONY**

*Dr. Knight's testimony*

Dr. Charles Knight was the first witness called by Byrd. He testified that he and Dr. Trawick both learned from Cloud the morning that he arrived

at Highland that he had been taking Plavix and aspirin. Dr. Trawick stopped the aspirin and Plavix after he advised Dr. Trawick that gallbladder surgery was a possibility. Dr. Knight agreed that a patient on blood thinners, regardless of whether it is an anticoagulant or an antiplatelet, has an increased risk of bleeding if injured. He added that there are many factors involved in clotting, and platelets are just one of them. He also agreed that the effect of aspirin and Plavix is to irreversibly remove or diminish the ability of platelets to clot. Although Dr. Knight never recorded in the medical record that Cloud had been taking aspirin and Plavix or that Cloud was at an increased risk of bleeding from those drugs, he was aware of the drugs when he determined that Cloud needed surgery.

Dr. Knight has been practicing surgery for 38 years. He agreed that any surgery carries the risk of some bleeding, but he maintained that the risk of bleeding is slightly increased when the patient is on aspirin and Plavix. He added that there is a rare risk of excessive or fatal bleeding when failing to control bleeding in a patient on aspirin and Plavix, but he agreed that was a risk that he should have been aware of. Dr. Knight also agreed that one standard of care applicable to him was to provide a reasonable protection to Cloud from excessive or fatal bleeding.

Dr. Knight understood that the effects of aspirin and Plavix continue in the body for 5-7 days after the drugs have been discontinued. However, Cloud needed gallbladder surgery at least urgently.

Dr. Knight testified that it takes about 45 minutes to type and match a patient's blood, send the information to the lab, and then get the platelets to the patient. However, he maintained that there was no reason to do a platelet

7

transfusion in this case. He believed that it was not the standard of care to give a platelet transfusion prophylactically. He agreed that if a patient is bleeding from surgery and he knows for certain the patient has a coagulopathy from an antiplatelet drug, then a platelet transfusion is an alternative to treat the bleeding. However, he also stated that platelet therapy is not indicated when there is ordinary bleeding after gallbladder surgery and it is not from a coagulopathy. Although he described the gallbladder surgery as difficult, he did not find excess bleeding during the first surgery that suggested coagulopathy from Plavix.

Regarding his instructions following the gallbladder surgery, Dr. Knight testified that blood pressure typically goes down following surgery, and he does not grow concerned until the systolic pressure gets below 100. Cloud's normal systolic blood pressure was 170, and it was around 90 when he saw him at 5:00 p.m., so he ordered a CBC and additional IV fluids. The CBC showed his hemoglobin was 12.5, which was not a significant drop from his level before surgery, so Dr. Knight did not think there was a definite sign of bleeding. Dr. Knight testified that he did not give the nurses an order regarding Cloud's heart rate because they knew to contact him if the heart rate went above 140.

Dr. Knight agreed that a doctor should be concerned about the possibility of bleeding when a patient at an increased risk of bleeding has hypotension and an elevated heart rate following surgery.

Dr. Knight agreed that hypotension and tachycardia are compatible with possible bleeding, but they could be caused by other things including sepsis. He disagreed that Cloud was exhibiting signs and symptoms by 4:00

8

p.m. on February 24 that he was bleeding internally and may need a second surgery. When he evaluated Cloud at 5:00 p.m., Cloud's blood count was down a little bit from where it was before the gallbladder surgery, which was expected and he did not think that was indicative of significant bleeding. While Cloud's blood pressure was on the low side at that time, he noted that Cloud was on narcotics, which can cause a drop in blood pressure. He also noted that infection from the gallbladder could cause hypotension.

Dr. Knight testified that it was around 11:00 p.m. on February 24 that he determined that Cloud was likely suffering from postoperative bleeding. He then scheduled the exploratory surgery to control the bleeding. He found nearly a liter of blood, much of which was clotted. He estimated that was 20% of Cloud's total blood volume.

Dr. Knight testified that he found no active bleeding during the second surgery. He could not prove what Cloud had bled from and could not say it was from the aspirin and Plavix. He explained that he will find diffuse oozing from the surgical surface when there is Plavix coagulopathy, but there was none of that in Cloud's case. The clots found in his abdominal cavity indicated that Cloud's blood was clotting.

Dr. Knight wrote in his narrative statement for the MRP that the likely cause of bleeding was a coagulopathy from his aspirin and Plavix use. He also wrote that Cloud's bleeding complication was likely related to coagulopathy from his aspirin and Plavix use. Dr. Knight explained that although that was what he thought when he wrote the narrative, as he has reflected on this case over the years, he believed there was no evidence of coagulopathy in either surgery. In his mind, there was no definite

9

coagulopathy. He considered that he used a poor choice of words in his narrative.

Dr. Knight did not believe that postoperative bleeding was a factor in Cloud's death or caused him injury, although it did require the exploratory surgery. He thought that Cloud would have survived if not for the sepsis. He explained that sepsis is an infection that causes multiple organs to fail. Although he never ordered a blood culture, it would have taken 48 hours to get the results back and the sepsis diagnosis was not made until right before he died.

Dr. Knight acknowledged that although he reached a sepsis diagnosis while Cloud was still alive, the word "sepsis" is never mentioned in the medical record. He explained that sepsis did not show up until the very end, and he did not know for certain until he checked the drain and Cloud's hemoglobin on the morning of February 25 and realized there was no sign of bleeding. He checked his records and noted that Cloud had severe metabolic acidosis, which goes along with sepsis. He did not think Cloud had sepsis on the morning of February 23.

Dr. Knight was not present when Cloud died. He testified that when he spoke to Dr. Richard Kamm, a critical care doctor who attended to Cloud on February 25, and Dr. Trawick in the following days, they agreed with him that Cloud died from sepsis. He testified that he thought shock on the discharge summary should be septic shock. He thought it was indisputable from the record that Cloud had septic shock.

10

### Dr. Trawick's testimony

Dr. Thomas Trawick testified as an expert hospitalist, pediatrician, and internal medicine physician. He recalled that Cloud was very uncomfortable from stomach and back pain when he arrived at Highland. He agreed that the fact that Cloud had been taking aspirin and Plavix became extremely important when he was to have urgent gallbladder surgery.

Dr. Trawick agreed that ideally when a patient has been on aspirin and Plavix, that surgery is delayed for 5-7 days so that new platelets can be formed. He stated that a platelet transfusion is not necessarily a treatment alternative to minimize the risk of bleeding when a surgical patient has been on aspirin and Plavix. He has never ordered platelets prophylactically for a surgery patient who has been on aspirin and Plavix unless they have a critically low platelet level.

Dr. Trawick saw Cloud the afternoon following his gallbladder surgery. There was nothing in his note from 3:20 p.m. that indicated Cloud was bleeding internally. Because of Cloud's low blood pressure and rise in creatine levels, he ordered IV fluids. He also ordered morphine, since Cloud was in a lot of pain, and that his blood pressure medications be held.

Dr. Trawick next saw Cloud at 5:35 p.m. He thought Cloud may have had too much pain medication, so he ordered Narcan and some fluids. Dr. Trawick did a verbal order at 7:00 p.m. for a urinalysis, but he could not recall why he ordered it. He did not see Cloud again before he died.

Dr. Trawick testified that he thought the causes of death in the discharge summary were correct. He had signed Cloud's death certificate.

11

Dr. Trawick had testified at his deposition that acute cholecystitis was the primary cause of death. He thought that blood loss and anemia were complicating factors, but that was not what Cloud had died from. That was still his position at the time of trial. He also agreed that Cloud had septic shock from his acute cholecystitis.

When Dr. Trawick was asked if the primary cause of death was acute cholecystitis, he responded that was what caused the condition. He added that as he looked at it now, he may change the order but would keep the same four causes listed. Asked if it would be more correct to say that the primary cause of death was septic shock secondary to his acute cholecystitis, he replied that was why he listed shock.

### Dr. Blum's testimony

Dr. Charles Blum testified as an expert in cardiology and internal medicine. He began treating Cloud in 1990. He put Cloud on aspirin in 1990 and on Plavix in 1994. He described Cloud's coronary artery disease as significant. In 2008, he diagnosed Cloud as having COPD with ongoing tobacco use. He described Cloud as a heavy smoker until 2009. Dr. Blum testified that Cloud was prescribed oxygen at home because he had damaged his lungs from smoking to such an extent that he was unable to maintain normal oxygen levels with exertion or sometimes even at rest. Dr. Blum testified that Cloud had a number of comorbid conditions when he went to the hospital on February 23.

Dr. Blum cleared Cloud for surgery from a cardiac standpoint. He testified that he thought that Cloud needed to have his gallbladder removed. Dr. Blum saw Cloud at around 4:30 p.m. after the gallbladder surgery. He

was sleepy, not making perfect sense, appeared to be in pain, and it looked like his abdomen was distended.

Dr. Blum explained that aspirin and Plavix make platelets less sticky. He stated that ideally a patient would be taken off aspirin and Plavix at least seven days before surgery. He agreed that a patient who has been on aspirin and Plavix is at greater risk of bleeding during an emergent or urgent surgery or following it. He cautioned that there is still a bleeding risk even if reversal steps to deal with blood thinners are taken because reversal is not necessarily complete.

Dr. Blum testified that the appropriate treatment to protect someone on aspirin and Plavix from excessive bleeding is to stop the drugs and then do a surgical assessment of the bleeding risk or any bleeding problems. Dr. Blum agreed that a platelet transfusion is an option for a surgical patient who has been on aspirin and Plavix. He thought Dr. Knight would take precautions before, during, and after the surgery to manage Cloud appropriately.

Dr. Blum testified that when he saw Cloud the afternoon after his surgery, it was clear there was a bleeding issue, but the etiology of what was making him ill was unclear. Cloud had a mild decrease in blood pressure and a mild increase in heart rate, which could be symptoms of internal bleeding. While he had a bleed, it was unclear if it was an active bleed. Dr. Blum also testified that some hours later there was a fall in the blood count, which suggested blood loss. Although Dr. Blum was unaware of any major bleeding during the gallbladder surgery, Cloud did bleed at some time after the surgery.

13

Dr. Blum agreed that a platelet transfusion might have reduced the risk of major perioperative or postoperative bleeding. He stated that platelets do not absolutely prevent bleeding. He testified that a red blood cell transfusion does not contain enough platelets to have a major impact on bleeding risks. Cloud lost about 20% of his total blood volume. Dr. Blum testified that massive blood loss in the range of 30% or more can result in acute shock and organ failure if not addressed. Dr. Blum agreed that second surgeries in the presence of aspirin or Plavix have an increased risk of repeat bleeding.

Dr. Blum thought that acute blood loss anemia was a contributing factor in Cloud's death, but he did not believe that it was the major contributing factor. He estimated that the anemia had a roughly 10% contribution to Cloud's death as it stressed him. Dr. Blum told Cloud's daughters following the second surgery that he was concerned that Cloud was not going to survive, but he did not recall telling them that Cloud had lost too much blood.

Dr. Blum believed that Cloud had developed sepsis from his gangrenous gallbladder, which had progressed to systemic inflammatory response syndrome, and he believed that was what caused his death. He added that Cloud had a pH level of 7.11 after the second surgery, which showed a severe buildup of acid in his bloodstream that was not being cleared by his kidneys or lungs. That was evidence of severe metabolic stress and a very poor prognostic marker. Dr. Blum acknowledged that loss of blood can result in acidosis in extreme circumstances. Dr. Blum testified

14

that Cloud was in kidney failure as shown by his blood work and the very poor output from his kidneys.

***Dr. Swirsky's testimony***

Dr. Brian Swirsky testified on behalf of Byrd as an expert in internal medicine and cardiology. He is board certified in internal medicine and cardiology. Although he has practiced interventional cardiology, he was not board certified in it. He thought that his training and education gave him expertise and practical knowledge in the management of patients before, during, and after surgery, from a cardiology standpoint. The trial court stated that Dr. Swirsky could testify as to the standard of care regarding the medical management of Cloud associated with the surgery.

Dr. Swirsky testified that clotting will not occur with the use of dual antiplatelet therapy. The platelets are poisoned for seven days from the last time that aspirin and Plavix were taken, and the only way to reverse that is to give new platelets. Dr. Swirsky testified that a platelet transfusion was a treatment option, and that it would have reduced the risk of major postoperative bleeding.

Dr. Swirsky believed that the blood began accumulating after the gallbladder surgery was completed. Regarding the clotted blood found during the second surgery, Dr. Swirsky explained that even when a surgical patient is on blood thinners, if the patient bleeds into a sidewall of the abdomen, a normal response is that the blood will still clot if it stays there long enough.

Dr. Swirsky testified that the standard of care was violated when the accurate documentation of the aspirin and Plavix use was left out of Dr.

15

Knight's consultation. There was no documentation of the assessment of Cloud having an excessive risk of bleeding during and after the surgery.

Dr. Swirsky believed that the standard of care was breached when the postoperative orders did not include careful monitoring of the blood count. The first blood count should have been ordered six hours after the gallbladder surgery with a repeat blood count ordered several hours after that.

Dr. Swirsky also testified that it was below the standard of care for Dr. Knight to tell the nurses in his postoperative orders not to contact him unless Cloud's systolic blood pressure fell below 80, which represented a 90-point drop from his normal blood pressure. Dr. Swirsky testified that a blood pressure drop of 90 to 100 points is profoundly hypotensive and in the shock range, and by shock range he meant organ dysfunction from a lack of blood supply. Dr. Swirsky agreed that order contributed to an unacceptable delay in recognizing that Cloud was suffering from a severe postoperative bleed. He also agreed that if a patient is bleeding, and particularly if it is uncontrolled and the doctor does not know the source, prompt diagnosis and intervention are part of the standard of care for a physician managing a patient.

Dr. Swirsky thought that Dr. Knight should have anticipated Cloud's risk of a potentially fatal bleed. He stated that if Dr. Knight had exercised good judgment in accordance with applicable medical standards, Dr. Knight would have issued orders requiring much closer monitoring of Cloud's postoperative condition for warning signs of bleedings. Those orders would have included frequent blood counts and to be notified if Cloud's blood

16

pressure dropped to a number higher than 80 or if his heart rate exceeded the upper level limits.

Dr. Swirsky testified that Dr. Knight's note at 5:00 p.m. contained some significant information as it showed Cloud's blood pressure was low and he had a distended and tender abdomen, which was consistent with abdominal bleeding.

Dr. Swirsky explained that bleeding is the number one condition to rule out when a surgical patient who has been on aspirin and Plavix exhibits hypotension and an elevated heart rate. He believed that the records suggested that Cloud had a postoperative bleed earlier than 10:00 p.m. on February 24. The blood count at 7:00 a.m. on February 24 showed that Cloud's hematocrit was 44, which was normal. The first blood count after the surgery, which was ordered at 5:00 p.m. and reported two hours later, showed his hematocrit had dropped to 36, which Dr. Swirsky considered to be a very significant drop and indicative of bleeding. Dr. Swirsky thought the hematocrit was not being followed carefully as it was not checked again until around the time of the second surgery. He believed that there should have been further follow-up on February 24 because Cloud was at high risk of bleeding, his blood pressure had dropped significantly, his heart rate was elevated, and his blood count had dropped. He added that the number one reason for those symptoms was bleeding.

Dr. Swirsky testified that it was below the standard of care for Dr. Knight not to do three things simultaneously when the CBC results came back at 7:00 p.m. showing an eight-point drop in Cloud's hematocrit level. He should have ordered a repeat CBC three hours after he ordered the one at

17

5:00 p.m., he should have ordered a cross and type for red blood cells and for platelets, and he should have ordered imaging of the abdomen to look for blood. If those things had been done timely, the bleeding would have been discovered by 8:00 p.m.

Dr. Swirsky stated that once bleeding was confirmed, the platelets and red blood cells would have been given, and then Cloud would have been brought back to surgery. Dr. Swirsky added that not all sources of bleeding can be corrected by surgery, but the patient can be supported by blood transfusions, and the bleeding can be significantly decreased by correcting the platelet dysfunction.

Dr. Swirsky maintained that time was of the essence because the longer that Cloud's blood pressure remained low, the more acid built up in the blood and the higher likelihood there was of multiorgan failure, beginning with the kidneys. He explained that acidosis does not equal sepsis, and that metabolic acidosis occurs from hypotension. Dr. Swirsky testified that Dr. Knight was late when he determined that the persistent low blood pressure for several hours was due to postoperative bleeding.

Dr. Swirsky testified that Cloud was still at an increased risk of excessive bleeding during the second surgery as it was an open surgery involving a more extensive dissection and with more bleeding associated with it. He believed that it was an additional violation of the standard of care for Dr. Knight not to utilize a platelet transfusion as part of his medical management of the second surgery. Dr. Swirsky testified that after the second surgery, Cloud had a continued low blood count despite transfusion,

18

persistent hypotension, persistent acidosis, and progressive multiorgan failure, all of which suggested continued bleeding.

Dr. Swirsky disagreed that sepsis killed Cloud. First, there was no documentation of sepsis in the record and Cloud was never treated for it. Second, Cloud had a profound drop in his blood count that was associated with persistent and very low blood pressure, which caused shock, multiorgan failure, significant acidosis, and a cardiac death.

Dr. Swirsky believed that the medical records confirmed that Cloud suffered excessive and potentially fatal bleeding from the gallbladder surgery. He believed that the cause of death was excessive bleeding from the aspirin and Plavix and which went untreated by Dr. Knight. He agreed that excessive blood loss can cause multiorgan failure, and in his opinion, multiorgan failure was a factor in Cloud's death. Dr. Swirsky also testified that systemic inflammatory response syndrome can be related to trauma.

When Dr. Swirsky initially looked at this matter, he believed that Dr. Blum failed to document the use of aspirin and Plavix in his preoperative consultation, which he thought put Dr. Knight at a disadvantage. He also faulted Dr. Blum for failing to appropriately monitor and treat Cloud for the possibility of bleeding.

Dr. Swirsky initially believed that Dr. Blum breached the applicable standard of care for a cardiologist in 2011. He also initially believed that Dr. Trawick breached the applicable standard of care for an internal medicine doctor. He based those conclusions on his review of the medical records which did not show that either Dr. Blum or Dr. Trawick had notified Dr. Knight of the bleeding risk from Cloud's aspirin and Plavix usage.

19

However, he testified at trial that Dr. Blum's and Dr. Knight's depositions were at odds with the medical records.

### Pamela Byrd's testimony

Pamela Byrd testified that her father sometimes used oxygen at night. However, he would not use it if she was not there to make him use it. She testified that Dr. Knight never told her before the gallbladder surgery that her father's use of aspirin and Plavix placed him at an increased risk of bleeding. She recalled that her father was in a lot of pain when he returned from the recovery room, and as the evening wore on, he became more agitated and restless. Another daughter, Patricia McKenna, testified as well.

### Dr. Marler's testimony

Dr. Kevin Marler testified on behalf of Dr. Knight as an expert in general medicine and in general surgery. He believed that Dr. Knight met the applicable standard of general surgical care in 2011 in his treatment of Cloud before, during, and after surgery. He also testified that Dr. Knight met all standards of care applicable to his medical and surgical management of Cloud when he evaluated and treated him. Dr. Marler agreed with the findings, reasonings, and conclusions drawn by Dr. Knight's MRP.

Dr. Marler testified that there is only one standard of care, which is what a reasonable physician would do in a similar situation, how he would react, and what he would do to treat the patient. He agreed that the standard of care applicable to any physician is to maintain full, complete, and accurate medical records. Dr. Marler stated that the fact that a patient was taking aspirin and Plavix should have been recorded in the medical records,

but he added that he never lists the medications when he dictates his consultations or when he dictates that medications were reviewed.

Dr. Marler explained that cholecystitis is when a gallstone blocks the outlet from the gallbladder, and it can form an abscess if it becomes infected. He added that it could be a surgical emergency and it feels painful. Dr. Marler testified that the increased risk of bleeding from the aspirin and Plavix was not important in Cloud's case because his gallbladder needed to be removed and Dr. Knight could not wait seven days. He thought that Dr. Knight knew about the aspirin and Plavix, but even if he had not, there was no change in the treatment or how Dr. Knight obtained hemostasis.

Regarding Cloud's blood loss, Dr. Marler agreed that a liter of blood was about 20% of Cloud's total blood volume and was a pretty good blood loss, but he added that it was not that big of an issue.

Dr. Marler testified that patients on Plavix clot their blood as their platelets still work, but only a little slower. If Dr. Knight was looking at the cystic duct and the gallbladder bed during the first surgery and they were not bleeding, that meant that it was clotted. He acknowledged that while Plavix probably made Cloud bleed for a little longer, if he was clotted at the time of the surgery then that meant those platelets were working enough.

Dr. Marler noted that at the end of the gallbladder surgery, Cloud's blood pressure went up, which could have been enough to blow off a platelet plug and it began oozing. He added that was something that could have happened to a patient not on Plavix. Dr. Marler accepted that either Dr. Knight overlooked bleeding during the gallbladder surgery or something unique to Cloud happened after the surgery to start the bleeding again. Dr.

21

Marler stated that while nobody had the answer for why Cloud started bleeding again, it could have been the increased blood pressure at the end of the surgery which caused it.

Dr. Marler testified that the biggest risk for bleeding during gallbladder surgery is from the cystic artery. Clips are used on it to stop bleeding. He added that the gallbladder is attached to the liver, and sometimes blood oozes from the gallbladder bed when the gallbladder is removed. A cautery device is used on the bed to obtain hemostasis. Dr. Knight's surgery note documented there was no active bleeding at the time of closure and he had obtained hemostasis. The anesthesiologist estimated Cloud's blood loss was around 100 ml, which Dr. Marler did not consider to be very much and was what he expected from a difficult laparoscopic gallbladder surgery. He added that there was nothing from the anesthesia record suggesting excessive bleeding during the surgery. Dr. Knight estimated that Cloud's blood loss was 150 ml. Dr. Marler testified that amount during a 75-minute procedure was not excessive.

Dr. Marler stated that the fact that Dr. Knight found no bleeding from either the gallbladder bed or from the cystic duct triangle during the second surgery meant that Cloud's bleeding had stopped on its own. He explained that sometimes a patient will bleed until the blood pressure drops a little bit. Cloud's hemoglobin levels and the drain output showed Cloud was not bleeding after the second surgery.

Dr. Marler testified that while Cloud was subject to a little bit more of an increased risk of bleeding from Plavix, that risk was not what it was made

out to be, and it was not a risk prohibiting Dr. Knight from removing the gallbladder. Cloud was at the same risk during the second surgery.

Dr. Marler estimated that Cloud had been having gallbladder issues for a while and then the gallbladder became really infected. Dr. Marler explained that when a gallbladder with necrotic mucosa is removed, there is a rush of toxins into the bloodstream.

Dr. Marler believed that Cloud died from sepsis triggered by his gangrenous gallbladder. The mucosal necrosis mentioned in the pathology report meant that the gallbladder was becoming gangrenous, which will lead to sepsis. He also thought some of the lab values suggested an overwhelming infection. He agreed that acidosis can be an indicator of sepsis, and it can also be caused by hypotension. The morning of the gallbladder surgery, Cloud's white count had doubled, which meant the infection was getting worse. His creatine and liver enzymes had gone up, which meant the liver and kidney were starting to decrease in function. Dr. Marler noted that this was before the surgery, so he was not bleeding at the time.

Dr. Marler testified that while the death certificate listed shock as a cause of death, there is septic shock and there is hemorrhagic shock. The latter shock is when a person bleeds to the point that they have a multisystem failure. He also noted that the first thing listed on the death certificate was acute cholecystitis, which is an infection. He added that patients with a gangrenous gallbladder have 5 to 10 times the mortality rate compared to patients with a non-gangrenous gallbladder. He stated that the ramifications of Cloud's cholecystitis and the treatment that it required

ultimately caused his death; the cause of Cloud's death was that he had a bad gallbladder and had to have it treated.

Dr. Marler thought that Cloud would have tolerated the blood loss more easily if his gallbladder was not gangrenous. He would not say that the blood loss did not have any adverse impact. However, the fact that Cloud was not bleeding after the second surgery and his hemoglobin levels increased without Cloud improving told Dr. Marler that it was not the blood loss that caused Cloud's death. While blood loss was a factor in his death, so were his age, COPD, and coronary artery disease.

### Dr. Kamm's testimony

Dr. Richard Kamm, who is board certified in internal medicine, pulmonary diseases, and critical care medicine, testified by deposition. He received a call at 5:30 a.m. on February 25 for post-surgery ventilator management. Dr. Knight asked for his help in managing the metabolic acidosis. Dr. Kamm ordered a blood gas test and received the results at 6:30 a.m. When he arrived at the CCU at 7:10 a.m., he ordered bicarbonate. He found that Cloud was critically ill, in respiratory failure requiring a ventilator, in acute renal failure, had metabolic acidosis, was anemic, and was in shock requiring the use of vasopressors. Dr. Kamm ordered IV fluids at a higher rate and additional bicarbonate to counterbalance the acidosis. He also adjusted the ventilator to combat the acidosis. He changed the IV drip to an epinephrine drip to facilitate blood flow to Cloud's organs, and adjusted Cloud's antibiotic dosage.

24

Kamm testified that he was told at 9:00 a.m. that Cloud remained significantly hypotensive.  He ordered additional bicarbonate and another blood gas test, but Cloud had coded before he could return to the CCU.

Dr. Kamm testified that one could argue that Cloud was in multiorgan system failure when he saw him.  While he agreed that some of Cloud's conditions could have been caused by bleeding, metabolic acidosis would not be caused by bleeding and was most likely due to his cholecystitis.

Dr. Kamm testified that he did not see anything from his review of the medical records which would support a medical malpractice claim against Dr. Knight.  He testified that he would give a platelet transfusion if a patient had a low platelet count or if the patient was having an ongoing and uncontrollable bleeding that was not amenable to surgery.

***Dr. Knight's additional testimony***

Dr. Knight also testified on his own behalf.  When he viewed the CT scan from Coushatta, he saw gallstones and a thickened gallbladder wall.  He ordered the CT scan with contrast to rule out a rupture or dissecting aneurysm.  That scan showed that Cloud possibly had acute cholecystitis.  The infection and inflammation in his gallbladder explained his pain.

Although he wrote his first progress note at 8:55 a.m., Dr. Knight testified that he saw Cloud earlier because he had told the hospital staff to call him as soon as Cloud arrived at Highland because he was concerned about the aneurysm.  He concluded by 8:55 a.m. that Cloud's abdominal pain was more likely related to gallstones, and his liver function tests raised the issue of whether it was a common bile duct stone or acute cholecystitis.  The repeat CT scan showed evidence of acute cholecystitis with gallstones

and wall thickening, and a small, old dissection of the infrarenal aorta that was not symptomatic. His plan was to start Cloud on IV antibiotics and to schedule the laparoscopic gallbladder surgery.

Dr. Knight testified that Cloud had unrelenting and persistent pain, which is typical for a patient with infected acute cholecystitis. His medical record from Coushatta stated that he had not had similar episodes of pain in the past. Dr. Knight testified that he thought that Cloud needed gallbladder surgery urgently.

Dr. Knight testified that the gallbladder was harder to remove because it was severely inflamed. There was no active bleeding when he closed the surgery site. Hemostasis was secured with electrocautery. He estimated the blood loss as 150 ml, which he thought was about normal for a patient with acute cholecystitis. Dr. Knight testified that Cloud was not having any clotting issues at the time of the gallbladder surgery.

According to Dr. Knight, the distension and tenderness that he found at 5:00 p.m. was a normal finding. He agreed with Dr. Trawick's order for IV fluids to increase Cloud's blood pressure. Dr. Knight testified that Cloud's hemoglobin level of 12.6 from the CBC that he had ordered at 5:00 p.m. on February 24 was in the normal range for someone with a hemoglobin of 14 to begin with and who had lost some blood and had received a lot of fluids.

Dr. Knight found a large amount of clotted blood in Cloud's abdomen, but no active bleeding, during the second surgery. He found no bleed from the gallbladder bed or from the cystic duct triangle. The clips were in place and there was no bleeding from the cystic artery. He testified

26

that the most common cause of bleeding would be if the cystic artery clips had come off, but they ruled that out. The second most common place of bleeding would be the gallbladder bed because that often oozes and the bleeding is controlled by electrocautery, but there was no diffuse oozing at all. He did not find the source of the bleeding despite looking everywhere.

Dr. Knight testified that during the second surgery, Cloud's systolic blood pressure went up to the 120 to 140 range. He received two units of red blood cells during the surgery.

Dr. Knight gave orders at around 2:35 a.m. following the second surgery. He ordered a transfusion of two more units of red blood cells and normal IV saline, monitoring of Cloud's fluid intake and output, Ativan for anxiety and agitation, discontinuance of the blood thinner Levonex, Levophed to keep Cloud's blood pressure above 90, and a consult with critical care medicine for ventilator management. He also ordered a CBC, a renal profile, and an evaluation of clotting. The Levonex had been prescribed to prevent deep vein thrombosis, but it had not been given to Cloud.

Cloud's hemoglobin at 4:45 a.m. measured 9.6 after a unit of red blood cells. At 6:30 a.m., it measured 10.7 after another unit of red blood cells. It had been 8.5 before surgery. Dr. Knight testified that the drain's output was two ounces of body fluids and a little blood. The rising hemoglobin levels following the transfusions and the minimal output from the drain supported Dr. Knight's belief that Cloud was not actively bleeding after the second surgery.

27

Dr. Knight believed that Cloud died from sepsis from a severely infected gallbladder. Although there was not a sepsis diagnosis in the medical records, he claimed that he treated Cloud for it by prescribing the broad-spectrum antibiotic Zosyn on the first day when he learned that Cloud had acute cholecystitis. He agreed that prolonged, severe hypotension that is not corrected can cause acidosis and multisystem failure. He believed that he met the applicable standard of care as a general surgeon in his treatment of Cloud.

Dr. Knight testified that there was no evidence of aspirin or Plavix-type bleeding that he had typically seen in the past. He thought that maybe a platelet plug had come off because Cloud was on aspirin and Plavix or because his blood pressure had gone up. He explained that the typical thing that he sees in patients on aspirin and Plavix is that they begin to bleed as soon as he makes an incision and they bleed from every surface, but he did not see that typical bleeding with Cloud. He further explained that typically patients who bleed from Plavix ooze from all of the surfaces being operated on, but there was no evidence of any severe bleeding and there was no active bleeding when both surgeries ended. He did not find excess bleeding in either surgery.

Dr. Knight testified that his narrative was his first position as to the issues. He wrote in it that it was thought that the likely cause of bleeding was a coagulopathy from Cloud's aspirin and Plavix use. He also wrote that although Cloud had a bleeding complication likely related to coagulopathy from his aspirin and Plavix use, the bleeding was not the cause of death.

**DISCUSSION**

*Standard of care*

Byrd contends that the jury committed manifest error when it found that plaintiffs failed to establish the standard of care applicable to Dr. Knight regarding his medical and surgical management of Cloud.

Appellate courts are required to review the entire record to ascertain whether manifest error has occurred; thus, the issue before an appellate court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Jones v. Market Basket Stores, Inc.*, 22-00841 (La. 3/17/23), 359 So. 3d 452; *Snider v. Louisiana Medical Mutual Ins. Co.*, 14-1964 (La. 5/5/15), 169 So. 3d 319.

To reverse a factfinder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. *Stobart v. State through Dept. of Transp. & Dev.*, 617 So. 2d 880 (La. 1993).

The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. *Jones*, *supra*; *Snider*, *supra*. Even if an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Cole v. State Dept. of Public Safety & Corr.*, 01-2123 (La. 9/4/02), 825 So. 2d 1134; *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989).

Where the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous; this rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. *Jones*, *supra*; *Snider*, *supra*.

A fact finder may evaluate expert testimony by the same principles that apply to other witnesses and has great discretion to accept or reject expert or lay opinion. *Newman v. LSU Health Sciences Center Shreveport*, 51,375 (La. App. 2 Cir. 5/17/17), 223 So. 3d 116, *writ denied*, 17-1196 (La. 10/27/17), 228 So. 3d 1234.

La. R.S. 9:2794(A) sets forth the burden of proof for a plaintiff in a medical malpractice lawsuit. The plaintiff must prove:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . . within the involved medical specialty.
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Thus, the medical malpractice plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom. *Pfiffner v. Correa*, 94-0924 (La. 10/17/94), 643 So. 2d 1228. A plaintiff can establish

the applicable standard of care through defense expert testimony and evidence. *Driver v. Willis Knighton Pierremont Health Center*, 56,039 (La. App. 2 Cir. 7/23/25), 416 So. 3d 974, *amended and aff'd*, 25-01057 (La. 11/19/25), 2025 WL 3227226.

Byrd argues that the legal issues presented in this appeal are identical to those in *Driver*, *supra*. In *Driver*, the patient presented at an Emergency Room with complaints including shortness of breath and general malaise. His daughter photographed a rash on his face which turned out to be shingles. However, he was not diagnosed with shingles and no rash on his face was mentioned in the medical records, which contained inaccuracies and errors. The doctor ordered a diuretic for the shortness of breath and instructed him to see his cardiologist. The patient went to another Emergency Room three days later and was properly diagnosed. Unfortunately, the shingles moved to his brain and he later died.

A jury found that the plaintiffs in *Driver* failed to prove the standard of care owed to the patient by the Emergency Room doctor and hospital. This court determined that a reasonable factual basis did not exist to support the jury's verdict, and that the jury was clearly wrong and manifestly erroneous in its finding. This court noted that there was ample evidence presented to the jury of the standard of care owed by the defendants. In particular, the defendants' expert witness, a member of the MRP, and the doctor from the second Emergency Room visit all had testified as to the standard of care.

In this matter, Dr. Swirsky testified as to standards of care involving: (1) accurate documentation of the aspirin and Plavix use; (2) monitoring of

Cloud's CBC, blood pressure, and heart rate; (3) nursing orders to contact Dr. Knight when Cloud's systolic blood pressure fell below a specific limit; (4) prompt diagnosis and intervention when there is bleeding; (5) what Dr. Knight should have done when there was an eight-point drop in Cloud's hematocrit; and (6) the reduction of the risk of surgical bleeding for patients who had been taking blood thinners such as aspirin and Plavix, including the utilization of platelet therapy.

It was within the province of the jury to reject Swirsky's opinions as to the standards of care. Swirsky was an internal medicine physician and cardiologist opining on the actions of a surgeon. Moreover, the testimony from other witnesses, including defendants' witnesses, was generic and sometimes vague about the standard of care. For example, Dr. Marler testified that the only standard of care is what a reasonable physician would do in a similar situation, how he would react, and what he would do to treat the patient. Dr. Marler also agreed that a standard of care applicable to any physician is to maintain full, complete, and accurate medical records. Dr. Knight agreed that one standard of care applicable to him was to provide a reasonable protection to Cloud from excessive or fatal bleeding.

Based on our review of this record, we conclude that there was a reasonable factual basis for the jury to find that Byrd did not prove by a preponderance of the evidence the applicable standard of care as to Dr. Knight practicing as a general surgeon in 2011, and that finding was not clearly wrong.

32

*Informed consent*

Byrd contends that the trial court committed legal error when it precluded plaintiffs from putting on evidence of lack of informed consent. She adds that the trial court compounded that error when it violated its own order.

Byrd maintains that the introduction into evidence of the medical records containing the two surgical procedure consent documents without objection along with Dr. Knight's introduction of the medical review panel opinion expanded the pleadings by making informed consent an issue to be determined by the jury.

A claim for surgical malpractice and a claim for breach of the duty to obtain informed consent are distinct causes of action based upon different statutory duties. *Salvador v. Main Street Family Pharmacy, L.L.C.*, 17-1757 (La. App. 1 Cir. 6/4/18), 251 So. 3d 1107.

A plaintiff in an action based on the failure to obtain informed consent is required to prove a material risk existed that was unknown to the patient, the physician failed to disclose the risk, the disclosure of the risk would have led a reasonable patient in the patient's position to reject the medical procedure or choose another course of treatment, and the patient suffered injury. *Nordgren v. State*, 53,480 (La. App. 2 Cir. 7/22/20), 300 So. 3d 473, *writ denied*, 20-01046 (La. 11/10/20), 303 So. 3d 1045.

The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed on appeal absent a clear abuse of discretion. *Taylor v. Nexion Health at Pierremont, Inc.*, 54,802 (La. App. 2 Cir.

12/14/22), 353 So. 3d 403, footnote 2, *writs denied*, 23-00057 (La. 3/14/23), 357 So. 3d 823, 23-00056 (La. 3/14/23), 357 So. 3d 830.

During opening statements, Byrd's attorney concluded by telling the jurors that Dr. Knight was supposed to obtain informed consent, but did not do so. He also stated that informed consent was part of the standard of care. He then stated that Dr. Knight never told Cloud or his family about the risks associated with Plavix and aspirin, or that a platelet transfusion was a treatment option.

After the opening statements were completed, Dr. Knight's attorney objected to Byrd's attorney's reference to informed consent as a cause of action since it was not pled or mentioned in the pretrial order. Dr. Knight's attorney responded that he pled a breach of the standard of care, and that the standard of care required informed consent for any surgery. He also argued that the informed consent forms were in the medical record which both sides were offering; thus, the pleadings would be expanded by the evidence. The court ruled that the informed consent claim was beyond the scope of the pleadings and was not presentable to the jury. The court further stated that Byrd was not permitted to present a cause of action for lack of informed consent. The court added that it was appropriate to argue that Dr. Knight's failure to consider the risk of excessive bleeding from aspirin and Plavix was evidenced by what was missing from the consent forms.

Defense counsel moved for a mistrial because of the references to informed consent and to the death certificate during opening statements. Byrd's counsel explained that he was not asserting and did not intend to assert an independent cause of action for lack of informed consent; rather the

34

lack of informed consent substantiated that Dr. Knight did not consider the effects of aspirin and Plavix.

Denying the motion for a mistrial, the court stated that the only reference to informed consent could be in what was contained or communicated in the medical records to reflect Dr. Knight's state of mind. The court issued its own motion in limine pertaining to informed consent.

Later in the trial, Byrd's attorney unsuccessfully argued that the pleadings were expanded when the defense raised the issue of informed consent through the introduction of the MRP opinion.

Byrd's argument is without merit. The trial court painstakingly set forth the limits placed on plaintiff's counsel when examining witnesses about matters that possibly involved informed consent. The trial court did not abuse its discretion in enforcing these limits and in ruling that the pleadings had not been expanded.

**CONCLUSION**

For the foregoing reasons, the judgment is affirmed at appellants' costs.